**HOUSING AUTHORITY OF the CITY OF OMAHA, NEBRASKA, et al., Plaintiffs,**

v.

**UNITED STATES HOUSING AUTHORITY, etc., et al., Defendants,**

National Tenants Organization, Inc., et al., Intervenors.

Civ. No. 71–O–287.

United States District Court, D. Nebraska.

Feb. 10, 1972.

J. A. C. Kennedy, Jr., Omaha, Neb., Patrick O'Brien, Chicago, Ill., William E. Doyle, Washington, D. C., for plaintiffs.

Daniel E. Wherry, Omaha, Neb., David Epstein, Libby Z. Grossman, Washington, D. C., for defendants.

Alvin Hirshen, Berkeley, Cal., for intervenors.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court on motion of the plaintiffs for summary judgment [Filing #30], on motion of the defendants to dismiss, or, in the alternative, cross-motion for summary judgment [Filing #36], and on motion of the intervenors for cross-motion for

summary judgment and for a preliminary injunction [Filing #35]. In addition, there have been filed three requests for exclusion from the class represented by plaintiffs [Filings #29, #32, #33].

Plaintiffs are Local Housing Authorities (hereafter LHA) created by local authorities and operating low rent public housing programs in various cities throughout the United States. One of the defendants is the United States Housing Authority, which was created in the original Housing Act of 1937, 50 Stat. 888, 42 U.S.C.A. § 1401 et seq., but whose functions in subsequent years were transferred to other agencies or consolidated in the Department of Housing and Urban Development (hereafter HUD) and which finally ceased to be a body corporate with perpetual duration in 1968, 82 Stat. 610, amending 42 U.S.C.A. § 1403. However, the other defendant is properly pleaded and is George Romney, Secretary of HUD, the agency of the United States charged with the responsibility of implementing the Federal low-rent housing programs. Intervenors are the National Tenants Organization, Inc. (hereafter NTO) and numerous local tenants organizations throughout the United States.

On February 22, 1971, HUD issued and served upon the LHA's Circulars RHM 7465.8 and 7465.9 (hereafter Circulars 8 and 9). On May 7, 1971, HUD transmitted to departmental, regional and field offices RM 7465.1 Supp. 2 (hereafter Supp. 2) which contained certain directives regarding the implementation of Circulars 8 and 9. Plaintiffs seek herein that the Court declare Circulars 8 and 9 unlawfully issued and invalid and that the Court enjoin any attempted enforcement of Circulars 8 and 9 by threatened withholding of funds, or otherwise.

Plaintiffs contend that Circulars 8 and 9 are unlawful because the proper administrative procedure was not followed in their promulgation. According to plaintiffs, the proper procedure was that provided in the Administrative Procedure Act (hereafter APA), 5 U.S.C.A. 500 et seq. Plaintiffs also allege that the circulars are invalid because they violate the express limitations of the power of HUD as set forth in the amendment of 1959, 73 Stat. 679, amending 42 U.S.C.A. § 1401. Defendants' threatened withholding of funds is alleged by plaintiffs to violate the Annual Contributions Contract (hereafter ACC).

Defendants argue that the HUD circulars were issued in compliance with procedural due process and did not violate APA requirements. Defendants also contend that the HUD circulars were validly issued in accordance with HUD's statutory authority, and that they do not exceed the provisions of the ACC.

Intervenors contend that the issuance of Circulars 8 and 9 are a valid exercise of HUD's power and that the circulars are in accord with the provisions of the ACC. According to defendants, the circulars were validly issued under the APA, although defendants contend HUD was not required to comply with the APA.

The Court will not be required to reach either the APA or the ACC issue, in view of its ruling on the question of the scope of HUD's power; however, it will comment briefly on the APA question later in this opinion.

Initially, the Court must rule as to whether the prerequisites to a valid class action under Rule 23 of the Federal Rules of Civil Procedure have been met.

The Court finds that requirements (1)–(3) of Rule 23(a) are met, which leaves for discussion the requirement of Rule 23(a) (4), that "the representative parties will fairly and adequately protect the interests of the class." It is evident herein from the requests for exclusion that at least a few of the members of the alleged class of plaintiffs are quite satisfied with the HUD circulars. The question is, will such a divergence of desire in respect

to the result the Court might reach cause the representation requirement not to be met. The 8th Circuit has recently stated the requirement as "representation is insufficient under Rule 23(a) when there is antagonism between the representative party and the class '*as to the subject matter of the suit.*'" Arkansas Ed. Ass'n. v. Board of Ed., Portland, Ark. Sch. Dist., 446 F.2d 763, 767 [8th Cir. 1971]. The situation herein is similar to the example cited with approval by the 8th Circuit in that case, that of where a fund is present which is insufficient to pay all the beneficiaries and thus each beneficiary has divergent views as to the result the Court should reach in that how much each should be paid. The representation requirement is met, it being the preservation of the fund that is the prime jurisdictional consideration. It appears to the Court that here the subject matter of the suit is the HUD circulars, which is altogether different than the hoped for result of the lawsuit. Here, it is the HUD circulars that are the prime jurisdictional consideration, thus the representation test as given by the 8th Circuit is met, and all those affected by those circulars constitute a proper class under Rule 23(a). Other courts have held specially on this point that the fact that some of the members of the class are satisfied with the action complained of is irrelevant. *See* e. g., Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920 [2nd Cir. 1968]. The question remains as to what type of class action of Rule 23(b) has been alleged. Examining the various classes under Rule 23(b), the Court concludes that this action is most properly brought under Rule 23(b) (2), a class action where "the party opposing the class has acted . . . on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ." Exclusion is not permitted in Rule 23(b) (2) class actions, 3B Moore's Federal Practice ¶ 23.55. Therefore, the motions for exclusion from the class action should be overruled.

In approaching the cross motions for summary judgment, the Court recognizes that under Rule 56 of the Federal Rules of Civil Procedure, "[t]he function of the summary judgment is to avoid a useless trial; and a trial is not only not useless but absolutely necessary where there is a genuine issue as to any material fact." 6 Moore's Federal Practice ¶ 56.15 1.–0. It appears there is certainly an issue of material fact remaining in the APA question, that of whether or not the plaintiffs had actual notice of the attempted rule making by HUD. Similarly, there appear to be issues of material fact remaining surrounding the ACC issue. However, the Court finds that there are no issues of material fact remaining as to the question of the power of HUD to issue the circulars attacked herein and the Court should not flinch from its duty of granting summary judgment merely because a difficult question of law is presented.

However, first the Court would like to comment briefly on the APA question. The uncontroverted facts show that HUD did not publish general notice of the proposed rule making in the Federal Register before the circulars were issued, as required by 5 U.S.C.A. § 553 (b). Defendants and intervenors argue that (1) HUD was not required to follow such procedure because of § 553(a) (2) which exempts "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or *contracts*." (emphasis added) and (2) that in any event HUD is exempted because § 553(b) does not require published notice to those persons having actual notice. The Court does not comment on this latter contention, (2), for the reason previously discussed. However, as to (1), it is the firm belief of this Court that the "contract" exemption of the APA was never intended to be used by agencies to escape the procedural requirements of the APA where the rule

making involved has the broad substantive impact demonstrated by the circulars herein. The fact of the matter is that HUD discharges its responsibilities set out in 42 U.S.C.A. § 1401 et seq., in this area of low-rent housing largely by inclusions in the ACC. However, the Supreme Court has spoken on this matter and if the NLRB cannot make prospective rules by use of adjudicatory proceedings, NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed. 2d 709 [1969], then this Court is of the opinion that HUD should not be able, in the name of the contract exemption, to make rules that have not only prospective effect but, according to recent decisions, see e. g., Thorpe v. Housing Authority, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 [1969], retroactive effect as well. Congress has seen fit to enact the APA, and agencies are not free, as the whim may take them, to ignore its provisions.

### DID HUD HAVE THE POWER TO PROMULGATE CIRCULARS 8 AND 9?

Passing now to the major problem in this matter, the Court begins by saying it appears that the law to be applied is contained in the *Thorpe* case. The conflict that has arisen is between the declaration of Congressional policy embodied in the amendment of 1959, 73 Stat. 679, amending 42 U.S.C.A. § 1401, which is known as the "local autonomy amendment," and the broad regulatory powers contained in 42 U.S.C.A. § 1408. 42 U.S.C.A. § 1401 provides in part that:

> It is the policy of the United States to vest in the local public housing agencies the maximum amount of responsibility in the administration of the low-rent housing program, including responsibility for the establishment of rents and eligibility requirements (subject to the approval of the Authority), with due consideration to accomplishing the objectives of this chapter while effecting economies.

42 U.S.C.A. § 1408 provides that:

> The Authority may from time to time make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this chapter.

This conflict was recognized in *Thorpe, supra,* at p. 277, 278, 89 S.Ct. at p. 524, wherein another HUD circular was tested. That particular circular required the LHA to provide each tenant "with a very simple notification procedure before evicting its tenants." The Supreme Court struck the balance between the two statutes by citing with approval what the circular did not do, saying:

> "*It does not . . . purport to change the terms of the lease provisions used by Housing Authorities,* nor does it purport to take away from the Housing Authority its legal ability to evict by complying with the terms of the lease and the pertinent provisions of the State law relating to evictions. It does not deal with what reasons are acceptable to HUD . . .. Moreover, the Circular clearly does not say that a Housing Authority cannot terminate at the end of any term without cause as is provided in the lease." (Emphasis added) (Footnotes omitted)

The Supreme Court then concluded that as such the circular had an insubstantial effect upon the basic lease agreement and the Congressional policy of allowing local authorities to retain maximum control over the administration of federally financed housing projects was not violated. From the language used by the Supreme Court, it appears that if the circulars at issue do purport to change the terms of the basic lease agreement then they are violative of the Congressional policy. There remains but to examine the circulars themselves. But first the Court notes that it has examined the three cases of which it is aware that have dealt with the circulars in question. In Glover v. Housing Author-

ity of City of Bessemer, Ala., 444 F.2d 158 [5th Cir. 1971], the question of the validity of the circulars was not presented and instead the Court focused on whether they were to be retroactively applied. In Chicago Housing Authority v. Harris, 275 N.E.2d 353, the Illinois Supreme Court based its conclusion of validity on the fact that plaintiff failed to demonstrate any specific infringements of the lease agreement and that the tenant must still pay rent and conform to other lease provisions. The infringements of the lease agreement will be discussed later in this memorandum. The Court submits that the test of *Thorpe* is not that the tenant must still pay rent and conform to other lease provisions. In Housing Authority of the City of Milwaukee v. Mosby, 192 N.W.2d 913, the Supreme Court of the State of Wisconsin did not dwell on the validity of the circulars but concluded that Circular 9 did not change the terms of the lease. This Court would tend to agree, it being Circular 8 that is required to be incorporated into the lease. Circular 9 will be discussed separately herein. That Court also felt that the pressing issue was that of retroactivity. For these reasons, the Court has found these decisions to be of little assistance, which has necessitated an in-depth reexamination of *Thorpe*.

Circular 8 is set out in Appendix A, but among its provisions are that dwelling leases must include (a) that management will accept rental payments without regard to other charges owed by the tenant to management, (b) the process by which rents and eligibility for occupancy is redetermined, (c) the use of separate legal process to collect monetary claims for damages, and (d) that tenant grievances shall be resolved in accordance with LHA procedures consistent with HUD regulations covering such procedures.

Circular 9 is set out in Appendix B, but basically it provides for LHA's to adopt grievance procedures, including a hearing for all tenant grievances and

that the decision of the official or panel that conducts the hearing shall be binding on the LHA but not upon the tenant.

Supp. 2 is set out in Appendix C and it deals with implementation of the lease and grievance procedures. It states in part that should the LHA's refusal to implement Circulars 8 and 9, the Regional Administrator may recommend withholding of federal funds (other than guaranteed subsidies) until compliance is had.

■ It is apparent from the evidence that the provisions of Circular 8 are not now contained in the basic lease agreement of the plaintiff LHA's. It would seem that, applying the test of *Thorpe*, the terms of the basic lease agreement are being varied and thus the Congressional policy is violated.

The evidence also indicates that the LHA's do not presently employ the grievance procedures of Circular 9. The legislative history of the local autonomy amendment indicates that it was designed to take the federal government out of dictating day to day management of the LHA. 105 Cong.Rec. 1869–1870 [1959] (remarks of Senators Clark and Proxmire). It appears to the Court that, if the LHA were to be required by federal mandate to hold a hearing for every tenant grievance, no matter how insignificant, this would put the federal government in the position of dictating the procedure for part of the day to day management of the LHA, which is the problem that was sought to be remedied in the "local autonomy amendment." It follows that the Congressional policy will be violated if Circular 9 is allowed to stand.

The Court is aware that in footnote 48 to *Thorpe* it is stated that "if the procedure (the simple notification of eviction) followed by the Authority proves inadequate, HUD may well decide to provide for an appropriate hearing." This Court is of the opinion that it is proper for HUD to make such a decision;

however, it is also of the opinion that to implement such a decision by way of a mandatory circular would require Congressional approval, in the face of the "local autonomy amendment."

 Being violative of the Congressional policy embodied in the "local autonomy amendment", this Court has no choice but to enjoin implementation of Circulars 8 and 9 as an invalid exercise of the power of HUD.

This ruling obviates the necessity of ruling on Supp. 2, but the Court feels that the result in such a case was foreshadowed also in *Thorpe, supra*, at footnote 33, where the Supreme Court stated that:

> A far different case would be presented if HUD were a party to this suit arguing that it could repudiate its obligations under the annual contributions contract because the Authority had failed to apply the circular.

It must be noted that the Court does not pass upon the wisdom nor the desirability of the provisions contained in Circulars 8 and 9. It may well be that they are needed from a standpoint of national uniformity. It might also be that were the requirements contained in the circulars solely before the Court on due process grounds, the Court might find many of them required. The circulars themselves and the Model Lease and Grievance Procedures accompanying them were developed from a series of meetings chaired by HUD during which representatives of HUD, NRO, NTO and other invited parties discussed many of the recurring tenant/management problems. The Court is of the opinion that such conferences are properly one of the functions of HUD and the sort of activity where HUD can be very productive. The Court only differs with HUD when HUD, instead of advising and making available model programs, turns and orders their implementation upon pain of financial deprivation. Such was never the intent of Congress.

An order pursuant to this Memorandum will be entered this date.

### APPENDIX A

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT RENEWAL AND HOUSING MANAGEMENT

CIRCULAR

| RHM 7465.8 |
|---|

2/22/71

Cancellation Date:

SUBJECT: Requirements and Recommendations To Be Reflected in Tenant Dwelling Leases for Low-Rent Public Housing Projects

1. PURPOSE. To set forth standards and criteria of management-tenant relationships to be embodied in dwelling leases in the low-rent public housing program.

2. BACKGROUND.

a. *The traditional landlord-tenant relationship* has been substantially changed in recent years by State statutes in many states as well as by a long series of legal decisions. This has been particularly true in public housing, the courts indicating that Local Housing Authorities have certain duties and obligations which cannot be avoided or circumvented by contractual provisions in leases with tenants. In line with these decisions and as a result of extensive discussions involving organizations representing Local Housing Authorities and tenants, HUD recently issued Circular RHM 7465.6, dated 8–10–70, prohibiting the inclusion in public housing leases of certain unfair or unreasonable provisions.

b. *Agreement was also reached* regarding the provisions that should be included in such leases to reflect the obligations, responsibilities, and duties of both management and

tenants. It was the belief of all the participants in such discussions that leases which reflect the obligations imposed upon public landlords by the courts, and the correlative obligations of tenants, would improve management-tenant relationships and promote an improved housing environment to the advantage of the low-rent housing program, its beneficiaries, and the communities in which such housing is located.

3. REQUIREMENTS.

a. *The Annual Contributions Contract* between a Local Housing Authority and HUD provides in Part II, Section 203(B):

"The Local Authority shall not permit any family to occupy a dwelling in any Project except pursuant to a written lease for such dwelling executed by a responsible member of such family, which lease shall contain all relevant provisions necessary to meet the requirements of the Act and of this Contract, and which lease shall provide that the Local Authority shall not terminate the tenancy other than for violation of the terms of the lease or other good cause. In terminating a tenancy, the Local Authority shall inform the tenant in a private conference or other appropriate manner the reasons for the eviction and give the tenant an opportunity to make such reply or explanation as he may wish."

b. *To implement this provision of the Contract,* all such dwelling leases shall include provisions covering:

(1) Names of the parties to the lease and the identification of the premises leased.

(2) The amount and due date of rental payments, and a proviso that management will accept rental payments without regard to any other charge owed by the tenant to management.

(3) The utilities and quantities thereof to be furnished to the tenant by management.

(4) The process by which rents and eligibility for occupancy shall be determined and redetermined including:

(a) The frequency of such rental and eligibility determinations.

(b) The information which the tenant shall supply to permit such determinations.

(c) The standards by which rents, eligibility, and appropriate dwelling unit size shall be judged.

(d) The circumstances under which a tenant may request a redetermination of rent.

(e) The effect of misrepresentation by the tenant of the facts upon which rent or eligibility determinations are based.

(f) The time at which rent changes or notice of ineligibility shall become effective.

(5) The limitation upon the tenant of his right to the use and occupancy of the dwellings.

(6) The responsibilities of the tenant in the maintenance of his dwelling and such other project areas as may be assigned to him for maintenance and upkeep, if any; and his obligations for intentional or negligent failure to do so.

(7) The use of separate legal process to collect monetary claims for damages.

(8) The responsibility of management to maintain the buildings and any unassigned community areas in a decent, safe, and sanitary condition in accordance with local housing codes and HUD regulations, and its obligations for failure to do so.

(9) The responsibility of management to provide the tenant with a written statement of the condition of the dwelling unit (when the ten-

ant initially enters into occupancy and when he vacates the dwelling unit), and the conditions under which the tenant may participate in the inspection of the premises which is the basis for such statement.

(10) The circumstances under which management may enter the premises during the tenant's possession thereof.

(11) The formalities that shall be observed by management and tenant in giving notice one to the other as may be called for under the terms of the lease.

(12) The circumstances under which management may terminate the lease, all limited to good cause, and the length of notice required for the tenant to exercise his right to terminate.

(13) The agreement that any tenant grievance or appeal from management's decision shall be resolved in accordance with LHA procedures consistent with HUD regulations covering such procedures.

(14) The usual signature clause attesting that the lease has been executed by the parties.

c. *No lease shall contain language* which establishes less than the minimum responsibilities and obligations on each of the parties as provided in the model lease shown as Appendix 1, with respect to the above required provisions.

d. *These provisions shall not apply* to leased housing units.

4. RECOMMENDATIONS.

a. *Security deposits* when required by LHAs should be limited to an amount not in excess of one month's rent, or some reasonable set amount. Provision should be made for the gradual build up of such security deposit; and any interest earned upon such security deposit should be considered money due to the tenant upon vacation of the premises less any amounts owing to management. Management should consult with tenants concerning an appropriate depository for such funds.

b. *Penalties for late payments for rent* are no longer assessed by many LHAs. Since such penalties have proved ineffective in improving rent collections and tend to exacerbate tenant-management relationships, it is strongly urged that they not be imposed.

## APPENDIX B

U. S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT RENEWAL AND HOUSING MANAGEMENT

CIRCULAR RHM 7465.9
2/22/71
Cancellation
Date:

SUBJECT: Grievance Procedures in Low-Rent Public Housing Projects

1. PURPOSE. To set forth requirements and recommendations for grievance procedures to be established by all local housing authorities.

2. BACKGROUND. In recent years, it has become more and more apparent that many of the problems faced by management and tenants in low-rent public housing have resulted in friction and strain in tenant-management relations and in litigation, costly to both management and tenants; much of which might have been avoided had some kind of procedure been available for grievances to be aired before an impartial individual or panel. Some of these problem areas are the examination of incomes to determine rents, the re-examination of incomes to determine eligibility for continued occupancy, the inspection of units to determine their

condition, the imposition of lease restrictions to protect project property, the procedures used to collect rents or evict families, and procedures to collect costs for repairs for damages to dwelling units or other project areas. In seeking solutions to these problems, HUD has brought together representatives of the local housing authorities, tenants, and professional arbitrators, and other interested organizations for a discussion of issues and approaches to tenant-management problems. After a series of meetings and extensive discussions regarding a lease and a grievance procedure applicable for use in the low-rent public housing program, it was agreed by the participants that establishment of a grievance procedure by every local housing authority, embodying certain standards and criteria, would improve management-tenant relationships and promote improved housing environment to the advantage of the low-rent public housing program thus implementing the national housing policy as expressed by Congress; and that provision for a grievance procedure should be included in all low-rent public housing leases. This is now required by Circular RHM 7465.8.

3. REQUIREMENTS. Each local housing authority shall adopt procedures or revise existing grievance procedures to embody, as a minimum, the following standards and criteria:

a. A tenant shall be afforded an opportunity for a hearing before an impartial official or a hearing panel if he disputes within a reasonable time any LHA action or failure to act in accordance with the lease requirements, or any LHA action or failure to act involving interpretation or application of the LHA's regulations, policies or procedures which adversely affect the tenant's rights, duties, welfare or status.

b. If it is determined by an LHA that a hearing panel shall be established, then the number of members on such hearing panel shall be an uneven number, provided that if LHA representatives are appointed as members of such hearing panel, then tenants shall be represented on the panel in equal number by tenants elected by the tenant body, with an impartial member appointed as a tie breaker.

c. If the tenant requests a hearing, the LHA shall notify him within a reasonable time prior to the hearing of the complete grounds or reasons for the LHA's disposition of the tenant's complaint or grievance.

d. The tenant shall be given notice of any rules and regulations governing the hearing within a reasonable time prior to the hearing.

e. The tenant shall be afforded an opportunity to present his side of the dispute, including the opportunity to be represented by counsel or another person of his choice, to bring in witnesses and to confront and cross-examine witnesses in appropriate circumstances.

f. When a decision is made, the official or panel that conducts the hearing shall notify the parties to the dispute in writing of the decision and the reasons and evidence relied on.

g. To the extent that the desion is not inconsistent with state law, the United States Housing Act of 1937, as amended, HUD regulations and requirements promulgated thereunder or the Annual Contributions Contract the decision shall be binding on the LHA, unless the LHA shall determine and notify the complainant in writing within thirty days of such decision that the hearing panel has acted arbitrarily or

exceeded its authority. In such event the matter may be subject to judicial review.

h. If the decision is in favor of the LHA or if the hearing panel elects not to act upon the complaint because the issue has already been decided in favor of the LHA in hearings of other complaints based on essentially the same set of facts, the LHA shall be free to pursue its remedies and the tenant may seek appropriate relief.

4. ADMINISTRATIVE EXPENSES. The LHA shall provide such space, secretarial service, and funds for administrative expenses as are reasonably necessary to accomplish the purposes of the grievance procedure, the costs of which shall be included as an operating expenditure in the annual operating budget submitted to HUD. This may include reasonable reimbursement for out-of-pocket expenses for attendance at hearing meetings by panel members.

5. MODEL GRIEVANCE PROCEDURE. Appendix 1 is a Model Grievance Procedure which embodies the requirements set forth above. It may be adapted to reflect the local situation and any applicable requirements of state law. The locally adopted Grievance Procedure may include applicants as well as tenants and may be adopted by an LHA for applicants as well as tenants.

APPENDIX C

INCOME LIMITS, RENTS, AND OCCUPANCY HANDBOOK

H 465.1 SUPP 2

IMPLEMENTATION OF MODEL LEASE AND GRIEVANCE PROCEDURES

1. PURPOSE. To prescribe responsibilities of the Area Office in the implementation of Circular RHM 7465.8, Requirements and Recommendations to be Reflected in Tenant Dwelling Leases for Low-Rent Public Housing Projects, and Circular RHM 7465.9, Grievance Procedures in Low-Rent Public Housing Projects, both dated February 22, 1971.

2. AREA OFFICE RESPONSIBILITY

a. The Chief, Housing Management and Tenant Services Branch (HMTS) is reponsible for taking action to have LHAs conform to the requirements of the Circulars.

b. The HMTS Branch should take affirmative action to see that LHAs do not delay implementation of the Circulars. The staff should encourage LHAs to act promptly and assist LHAs, if requested, to adapt the model documents to reflect local conditions or the requirements of State law.

c. Every effort taken to have an LHA act promptly to conform to the requirements of the Circulars shall be fully documented in the event it becomes necessary to support a recommendation for action to be taken against the LHA pursuant to paragraph 4 below. In addition, documentation should be made of activities of the LHA to implement the Circulars.

3. TIMING OF IMPLEMENTATION BY LHAs

a. LHA leases which do not conform to the requirement of Circular RHM 7465.8 should be replaced with new leases as soon as the LHA can reasonably be expected to make the necessary modifications and arrange for execution of the new leases.

b. It is intended that the grievance procedure should be applicable in re-

spect to a grievance or complaint which is unresolved at such time as a grievance procedure is adopted by an LHA or which occurs thereafter. For this reason, activities taken by LHAs to delay the adoption of grievance procedures should be strongly discouraged by the HMTS staff.

4. HUD ACTION FOR FAILURE OF LHA TO IMPLEMENT. If the Area Director determines that an LHA is refusing or purposely failing to implement the Circulars, he shall refer the matter to the Regional Administrator, with a statement of the basis of his determination and any supporting information or records, and recommend action to be taken against the LHA, such as withholding funds (other than guaranteed subsidies), referral of the matter to the Department of Justice for action to enforce compliance, or such other action as may be authorized and deemed appropriate. If the Regional Administrator determines that action at the Central Office level is indicated, he shall refer the matter to the Assistant Secretary for Housing Management.

5. RESPONSIBILITY WHERE AREA OFFICES DO NOT EXIST. Where Area Offices have not been established, the actions specified in paragraph 2 shall be the responsibility of the Director, Tenant Operations and Services Division, of the Regional Office or the ARA for Housing Management and Community Services for Denver. Also, where Area Offices have not been established, the actions specified in paragraph 4 for the Area Director shall be the responsibility of the Regional Administrator.