**Martin BERENDS et al., Plaintiffs,**

v.

**Earl L. BUTZ, Secretary of Agriculture of the United States, et al., Defendants.**

**No. 4–73 Civ. 41.**

United States District Court,
D. Minnesota,
Fourth Division.
March 20, 1973.

Frank Claybourne, Vance K. Opperman, Joseph R. Kernan, Jr., St. Paul, Minn., for plaintiffs.

Robert G. Renner, U. S. Atty., by Thorwald Anderson, Asst. U. S. Atty., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

On January 19, 1973, plaintiffs commenced this action against the Secretary of Agriculture of the United States and certain subordinate officials of the United States Department of Agriculture,

Farmers Home Administration (FHA), seeking temporary and permanent injunctive relief, declaratory relief and further relief in the nature of mandamus. The thrust of plaintiffs' action is that the Secretary of Agriculture acted unlawfully and beyond the scope of his authority in terminating the FHA emergency loan program on December 27, 1972. Plaintiffs seek reinstatement of that program.

On February 15, 1973, pursuant to Plaintiffs' Motion for a Preliminary Injunction, a hearing was held before this Court in Duluth, Minnesota. At that time, oral argument was heard and briefs and affidavits were submitted by plaintiffs and defendants in support of their respective positions. At the conclusion of plaintiffs' argument, plaintiffs moved that the Court order the advancement of the trial on the merits and its consolidation with the application for the preliminary injunction, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure. Because the relief prayed for by plaintiffs and others similarly situated, if granted, will be fully meaningful only if granted prior to the 1973 planting season and in no event later than June 30, 1973, the Court granted the motion, ordered the consolidation, and advanced the trial on the merits to March 5, 1973. At that time, defendants moved to dismiss the amended complaint on the ground that the actions complained of were totally within defendants' discretion. Alternatively, defendants moved for summary judgment. Both motions were denied and full trial on the merits was held.

### Parties

▇ Plaintiffs are four farmers residing in the 15 county area designated as an "emergency loan" area, who were precluded from applying for emergency loans because of the directive of the Secretary of Agriculture halting the program in Minnesota. The action is brought as a class action. The Court finds that the class is so numerous that joinder of all members is impracticable;

that there are common questions of law and fact common to the class; that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and that the representative parties will fairly and adequately protect the interests of the class. Furthermore, the defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. The action is maintainable as a class action with the class being defined as those farmers in need of agricultural credit as the result of "natural disasters" who operate farms in one or more of the fifteen Minnesota counties involved herein, and were precluded from applying for emergency loans by the directive of the Secretary of Agriculture and the actions taken thereunder terminating the emergency loan program in Minnesota.

Defendants include the Secretary of Agriculture, the National Administrator and Assistant Administrator of the Farmers Home Administration, the Chief of the Emergency Loan Division of the Farmers Home Administration; and the State Administrator of the Farmers Home Administration for the State of Minnesota.

### Factual Background

In the fall of 1971 and spring of 1972, a large part of western and central Minnesota suffered excessive and prolonged rainfall to such extent as to seriously and injuriously interfere with and delay the planting of crops in the spring of 1972. With many years of experience, area farmers were unable to recall such extreme and prolonged conditions of rain and wetness. Because of these conditions, many farmers in the affected areas were unable to get into their fields to plant some of their 1972 crops at all. To the extent planting was possible, in many cases it was only possible critically late in the season—for example, late June or July, 1972. Even after planting, replanting was often required

because the seed would rot in the wet soil. Because of the weather, harvests of many farmers were very small; many of the crops were almost totally destroyed.

As a result of these weather conditions, on June 26, 1972, defendant Earl Butz, United States Secretary of Agriculture, declared that fourteen counties in western and central Minnesota had experienced "natural disasters" and designated those fourteen counties "emergency loan areas." This designation was published in the Federal Register, Volume 37, No. 126, page 12854, and provides as follows: [1]

### DESIGNATIONS OF AREAS FOR EMERGENCY LOANS

For the purpose of making emergency loans pursuant to section 321 of the Consolidated Farmers Home Administration Act of 1961 (7 U.S.C. 1961) and section 232 of the Disaster Relief Act of 1970 (Public Law 91–606), it has been determined that in the following counties in the State of Minnesota natural disasters have caused a general need for agricultural credit:

#### COUNTIES

| | |
|---|---|
| Big Stone | Pope |
| Chippewa | Renville |
| Douglas | Stevens |
| Grant | Swift |
| Kandiyohi | Traverse |
| Lac qui Parle | Wilkin |
| Meeker | Yellow Medicine |

Emergency loans will not be made in the above-named counties under this designation pursuant to application received after June 30, 1973, except subsequent loans to qualified borrowers who received initial loans under this designation. The urgency of the need for emergency loans in the designated areas makes it impracticable and contrary to the public interest to give advance notice of proposed rule making and invite public participation.

Done at Washington, D. C., this 26th day of June, 1972.

Earl L. Butz,
Secretary.

On June 26, 1972, pursuant to this designation of "emergency loan areas", the National Office of the FHA, by defendant Willard H. Ballard, Director of the Emergency Loan Division of the FHA, sent the following "notification" telegram to the Minnesota State Director of the FHA indicating that these fourteen Minnesota counties had been designated "emergency loan areas." This notification provides as follows:

Effective immediately Big Stone, Chippewa, Douglas, Grant, Kandiyohi, Lac qui Parle, Meeker, Pope, Renville, Stevens, Swift, Traverse, Wilkin and Yellow Medicine Counties are designated for emergency loans. Initial emergency loan applications will not be received or approved after June 30, 1973, *except applications pending on that date will be completed.* (Emphasis added)

On June 28, 1972, defendant Gordon F. Klenk, State Director of the FHA for the State of Minnesota, sent a bulletin to County FHA offices in each of the fourteen designated Minnesota counties. This bulletin provides in pertinent part as follows:

Effective immediately the following counties have been designated eligible for Emergency loans by the Secretary of Agriculture:

[Enumeration of the fourteen Minnesota counties omitted.]

Initial Emergency loans may be approved in these counties as authorized in FHA Instruction 441.2 to eligible applicants who have suffered produc-

---

1. Subsequently, on September 20, 1972, defendant Butz declared that Stearns County, Minnesota, had suffered a "natural disaster" and also designated it an "emergency loan area." This designation is published in the Federal Register, Volume 37, No. 187, page 20122. There are, therefore, fifteen affected Minnesota counties involved in this action.

tion losses caused by excessive moisture conditions and not compensated for by insurance or otherwise. Initial loans for Emergency applicants *will not be received* or approved after June 30, 1973, except applications pending on that date will be completed.

*It is not anticipated that a large volume of applications will be received until after the harvest season*; however, where an immediate need for credit exists, the loan should be processed, approved and routed to the State Office for review. We plan to hold an Emergency program meeting with county office personnel in the near future.

County Supervisors in the affected counties should notify the County U. S.D.A. Defense Chairman and see that the public is adequately informed of the emergency designation. The attached news release may be used in the affected counties. (Emphasis added)

This bulletin (as well as the attached "News Release") indicates that emergency loan applications would be accepted and processed through June 30, 1973. It is clear, from the language of this bulletin, that the State Director anticipated that most applications would not be submitted until after the harvest season which was late November or early December, 1972.

Subsequent to the fourteen-county emergency loan designations of June 26, 1972, and the Stearns County designation of September 20, 1972, informational meetings were held throughout the designated areas by State, District and County FHA officials. Relying upon the designations of the National Office of the FHA, these FHA officials informed interested farmers that: (1) applications would be accepted and processed through June 30, 1973; (2) that farmers should not file until after their harvest to make sure that all eligible losses were included in their applications; and (3) that plenty of money was available in the program. Relying upon these

representations, many farmers, including plaintiffs and others similarly situated, waited until after the 1972 harvest to file emergency loan applications.

As anticipated by State FHA officials, a substantial portion of emergency loan applications were not submitted until after the harvest season—late November and December, 1972. Between that time and December 27, 1972, many farmers in the fifteen-county emergency loan area contacted local FHA officials for appointments to submit emergency loan applications. Because of the large number of applicants that sought to apply after harvest, County FHA officials were forced to make appointments with many such applicants to review their applications—before formal acceptance—in January, February and even March, 1973.

However, on December 27, 1972, without warning or notice of any kind, the Secretary of Agriculture, by teletyped message to the Minnesota State FHA office, directed the cessation of acceptance of emergency loan applications in these Secretarially designated counties. This teletyped message provides as follows:

Revised government policy requires that emergency and rural housing disaster loans will be handled as follows: *Cease receiving applications, processing, or approving E. M.* [emergency] and R. H. D. *loans in all secretarial designation areas sixty days after designation.* Hurricane Agnes and Rapid City, South Dakota, areas, Presidential only, will terminate January 15. All other Presidential designations terminate June 30, 1973. No added Secretarial designations are expected for the balance of 1973. Loan dockets approved and postmarked or in St. Louis by close of business December 27 will be honored. Notify county offices by telephone. Bulletin follows. (Emphasis added)

The message was addressed to all State Directors of the FHA and was received in the Minnesota office at 4:20 p. m. on December 27, 1972 just prior to

the close of the business day. Whereas the directive terminated the emergency loan program as far as the plaintiffs were concerned, it continued the program in those areas designated by the President.

None of the County Supervisors in Secretarially designated areas who administered the FHA emergency loan program at the local level received notice of the termination of the program in their counties on December 27; nor did any County FHA Supervisors receive this notice on the next day, December 28, 1972. All Federal offices were officially closed on December 28, 1972, because of President Truman's funeral. Consequently, it was not until December 29, 1972, that the State FHA office notified the County Supervisors of the termination. Typically, John Schulz, County Supervisor, FHA, for Chippewa and Yellow Medicine Counties, received notice of the termination at approximately 11 a. m. on December 29.

Testimony indicated that never before has a Secretary of Agriculture ordered the permanent halt of an emergency loan program in Secretarially designated emergency loan areas without notice and prior to the date specified in the original designation.

Subsequent to December 27, 1972, and prior to February 15, 1973, when this Court issued a Temporary Restraining Order directing FHA to resume accepting (but not processing) applications from farmers in the fifteen Minnesota Secretarially designated counties, all Minnesota FHA offices have refused to accept, process or consider emergency loan applications from plaintiffs and others similarly situated.

### Jurisdiction

█ As the action is in the nature of mandamus, to compel defendants to perform ministerial duties owed plaintiffs, this Court has jurisdiction of the controversy under 28 U.S.C. § 1361. The scope of the Court's review is set out in Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 et seq.

The scope of review under the Administrative Procedure Act is stated at 5 U.S.C. § 706. That provision provides in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be— . . .

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

.    .    .    .    .    .

█ The doctrine of sovereign immunity, raised by defendants, is inapplicable since plaintiffs contend that the defendants' actions were beyond the scope of their authority or they were acting unconstitutionally. Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 10 L.Ed.2d 15 (1962).

### Conclusions of Law

█ It is the position of the plaintiffs that the unilateral termination of the emergency loan program without public notice was in violation of the mandatory language of the applicable statutes and administrative regulations, as well as violative of the due process clause of the Fifth Amendment. The Government, on the other hand, maintains that the administration of emergency loans is committed by law to the discretion of the Secretary, and hence is not subject to judicial review by this

Court, pursuant to 5 U.S.C. § 701.[2] However, plaintiffs correctly point out that they are challenging only ministerial acts of the administrators. The language in the statutes and regulations relied on by plaintiffs is not of a permissive nature, but affirmatively directs defendants to perform. Whereas the Secretary may have a great deal of discretion in the administration of emergency loans, he has no license to act in violation of mandatory language of statutory laws or agency regulations.

The statutory basis for the emergency loan program is provided in 7 U.S.C. § 1961 which reads:

(a) The Secretary may designate any area in the United States   .   .   . as an emergency area if he finds

(1) that there exists in such area a general need for agricultural credit which cannot be met for temporary periods of time by private, cooperative, or other responsible sources, at reasonable rates and terms for loans for similar purposes and periods of time, and

(2) that the need for such credit in such area is the result of a natural disaster.

As to this part of the statute, it is clear that the decision whether or not to designate an area an "emergency loan area" is committed to the discretion of the Secretary. However, the Secretary has exercised his discretion in this regard; he has designated this fifteen county area as an "emergency loan area." 7 U.S.C. § 1961(b) "authorizes" the Secretary to make loans in such a designated area. The chief benefit flowing from a Secretarial designation is the availability of emergency loans. It is clear from the legislative history that Congress intended that emergency loans would be available in those areas designated as emergency loan areas. In the Senate Report accompanying the Agriculture Act of 1961 it is stated:

Sec. 321(a) *Designation of areas—* The bill proposes that emergency loans *would be available* whenever the secretary finds that there exists a need for credit not available from private, cooperative, or other responsible sources due to the occurrence of a natural disaster.   .   .   .

(b) *Eligibility*—Under the bill emergency loans *would be made available* to any farmer or rancher in the designated area.   .   .   . (Emphasis added) S.Rep. No. 566, 87 Cong., First Session (1961); 2 U.S.Code Cong. & Admin.News 1961, p. 2313.

Furthermore, Section 5 of P.L. 92–385, adopted in August of 1972 as an amendment to 7 U.S.C. §§ 1961–1967 provides:

(e) The benefits provided under this section shall be applicable to all loans qualifying hereunder, whether approved before or after the date of enactment of this section.

"Shall" is mandatory language. The only sensible reading of these statutes requires the Secretary to apply emergency loan benefits to all loans qualifying under these provisions. In order to apply the benefit provisions, the Secretary must first determine which loan applicants qualify. To follow the dictate of Congress, the Secretary must accept loan applications and consider them.

In Dubrow v. Small Business Administration, 345 F.Supp. 4 (D.Cal.1972), the right to apply for small business administration disaster loans was at issue. The government contended that under the Disaster Relief Act of 1972, 42 U.S. C. § 4451, the agency had absolute discretion to determine whether or not to

---

**2.** 5 U.S.C. § 701(a) provides:
   This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or
(2) agency action is committed to agency discretion by law.

make a loan under the Act. Of this, the Court stated:

> The Disaster Relief Act clearly states that the SBA shall administer disaster relief loans in accordance with its administration of the Disaster Loan Program. Under 15 U.S.C. § 636(b) the agency is empowered to make such loans as "the Administration may determine to be necessary or appropriate." This language calls for a determination, which implies that some consideration of each application must be undertaken. While it may be true that an individual has no right to receive a loan under the Disaster Loan Program, he does have the right to file an application and to have his application reviewed. In Simpkins v. Davidson, 302 F.Supp. 456 (S.D.N.Y. 1969), the plaintiff brought a mandamus action seeking to enjoin the SBA from refusing to grant him a loan. The Court held that Section 634(b) removed any jurisdiction the Court might have to compel the agency to grant plaintiff a loan, but that it had a statutory duty to process the plaintiff's loan application. What *Simpkins* makes clear is that discretionary acts of the SBA may not be reviewed, but, acts which are tantamount to a refusal to exercise discretion are subject to judicial review. Whatever the limits on this Court's authority to review denial of an application, they do not preclude judicial review when the SBA has refused to follow its statutory duty to determine whether the loan to a given applicant is necessary or appropriate. 345 F.Supp. 8, 9.

The situation in the instant case is virtually identical. It is clear from the reading of the statute that Congress has directed the Secretary to accept and consider loan applications from those counties which have been designated as "emergency loan areas." The Secretary's refusal to comply with the statutory language, and the subsequent termination of the emergency loan program was accomplished in excess of the Secretary's authority and is unlawful.

■■ Not only was the administrative action taken in excess of statutory authority, but it also was in violation of the duly promulgated regulations set up by the Department of Agriculture. Validly issued regulations of an administrative agency have the force and effect of statutes. *See,* Sheridan-Wyoming Coal Co. v. Krug, 84 U.S.App.D.C. 288, 172 F.2d 282 (1949). The failure of an administrative agency to follow its own established procedures constitutes a violation of procedural due process. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959); Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). As stated in United States v. Heffner, 420 F.2d 809, 812 (4th Cir. 1970):

> An agency of the government must scrupulously observe the rules, regulations or procedures which it has established. When it fails to do so, its actions cannot stand and the courts will strike it down. This doctrine was announced in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). There, the Supreme Court vacated [the] deportation order of the Board of Immigration because the procedure leading to the order did not conform to the relevant regulations. The failure of the Board and of the Department of Justice to follow their own established procedures was held a violation of due process. The *Accardi* doctrine was subsequently applied by the Supreme Court in Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959), and Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1950) . . .

> It is of no significance that the procedures or instructions which the . . . [agency] . . . has established are more generous than the Constitution requires. In Service v. Dulles, supra, the Supreme Court vitiated the discharge of a foreign service officer because of the State De-

partment's failure to follow its own procedures. The Court concluded that it made no difference that the State Department had no statutory or constitutional obligation to establish the procedure in question:

> While it is of course true that . . . the Secretary was not obligated to impose upon himself these more rigorous substantive and procedural standards . . . having done so he could not, so long as the Regulations remained unchanged, proceed without regard to them. 354 U.S. 388, 77 S.Ct. 1165.

The regulations involved give the Secretary the discretion to determine whether or not an area should be designated as an "emergency loan" area.[3] However, as pointed out previously the Secretary has exercised his discretion in this regard, and his original designation of the fifteen Minnesota counties as "emergency loan" areas has not been revoked or repealed. The directive of December 27, 1972 sent to State FHA Directors, does not purport to remove the designation but merely halts the processing of loans under the statute.

■ However, under the applicable regulations the Secretary has no absolute authority to halt the emergency loan program in those areas designated as emergency loan areas. The language of the regulation is clear that emergency loans *will* be made available in the counties so designated.[4] The language in the regulations is mandatory and the Secretary is directed to consider applications for emergency loans in designated areas. The refusal to consider applications for emergency loans in designated areas is a violation of the Department's regulations.

Inasmuch as emergency loans were made available up until December 27, 1972, it could be argued that the Secretary fulfilled his obligation under the statutes and the regulations. However, in this respect the method of termination of emergency loan benefits must be considered. The rights of individuals in so important a matter as procuring emergency relief to help restore damage caused by a natural disaster should not be at the mercy of the whims of an administrator. The unilateral termination of the program without notice to the Minnesota farmers offends all traditional notions of fair play. The people have a right to expect better treatment from their government. In Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (D.C.Cir. 1964), the Secretary of Agriculture debarred a contractor from doing any further business with the Department. The matter was handled in summary fashion. In defending a subsequent suit brought by the contractor, the government argued that since a citizen has no "right" to do business with the government, there is no standing for this lawsuit. Judge Burger, now Chief Justice, disposed of this argument:

> Thus, to say that there is no "right" to government contracts does not resolve the question of justiciability. Of course there is no such right; but that cannot mean that the government can act arbitrarily, either substantively or procedurally, against a person, or that such person is not entitled to challenge the processes and the evidence before he is officially declared ineligible for government contracts.

---

3. "The Secretary of Agriculture may designate an area as an E. M. loan area when there exists a general need for agricultural credit resulting from a natural disaster." Section 1832.3(b). 37 Federal Register 72 p. 7294.

4. "E. M. loans will be made available in counties named by OEP as eligible for Federal assistance under a major disaster declaration by the President, in counties designated by the Secretary . . ." Section 1832.3. 37 F.R. 72, page 7294.

"Eligible applicants who are operators of not larger than family farms . . . whose credit needs are for annual recurring operating expenses which can be repaid from the year's income, . . . will receive E. M. loans instead of operating loans." 37 F.R. 72, page 7298.

An allegation of facts which reveal an absence of legal authority or basic fairness in the method of imposing debarment presents a justiciable controversy in our view. 334 F.2d 574, 575.[5]

In looking to the Secretary's actions it should be pointed out that although it is provided that the Secretary may specify the period within which initial loans may be made, nowhere is the Secretary given the authority to accelerate, or disregard the initial termination date. Looking to the Department's regulations, it is provided:

When an area is designated by the Secretary, the National Office will notify the State Director and Finance Office regarding such area designation. The notification will specify the period within which initial loans may be made to new applicants as a result of the disaster for which the area was designated. State Director will notify immediately the county offices involved. . . . The State Director also . . . will make such public announcements as appear appropriate.

On June 26, 1972 and September 20, 1972, in compliance with these regulations, the National Office of the FHA did inform the State Director of the designation and did specify that the loans be available until June 30, 1973. Public notice was given as to this deadline. The regulation contemplates that the public will be informed as to the designation and the specified period for applying for the loans so as to provide opportunity to take advantage of the loan program. Nonetheless the Secretary, without prior notice, terminated the program depriving thousands of disaster victims from applying for emergency loans.

The unilateral termination of the program without notice was also a violation of a rule promulgated by former Secretary of Agriculture Clifford Hardin which states:

Notice is hereby given of the policy of the Department of Agriculture to give notice of proposed rule making and to invite the public to participate in rule making where not required by law. 5 U.S.C. § 553 provides generally that before rules are issued by Government agencies, notice of proposed rule making must be published in the FEDERAL REGISTER, and interested persons must be given an opportunity to participate in the rule making through submission of data, views, or arguments.

The law exempts from this requirement rules relating to public property, loans, grants, benefits, or contracts.

The Administrative Conference of the United States has recommended that Government agencies provide for public participation when formulating rules relating to public property, loans, grants, benefits, or contracts as a matter of policy.

The advantages of implementing the Conference's recommendation that the public be afforded an opportunity for greater participation in the formulation of rules relating to public property, loans, grants, benefits, or contracts will outweigh any disadvantages such as increased costs or delays.

The public participation requirements prescribed by 5 U.S.C. § 553(b) and (c) will be followed by all agencies of the Department in rule making relating to public property, loans, grants, benefits, or contracts. The exemptions permitted from such requirements where an agency finds for good cause that compliance would be impracticable, unnecessary or contrary to the public interest will be used sparingly, that is, only when there is a substantial basis therefor. Where such a finding is made, the finding

---

5. In the instant case, the farmers' position is even stronger inasmuch as there is a right to have disaster loan applications submitted and considered. Dubrow v. Small Business Administration, *supra*, and Simpkins v. Davidson. *supra*.

and a statement of the reasons therefore will be published ,with the rule.[6] *Effective date:* Upon publication in the FEDERAL REGISTER (7–24–71) 36 F.R. 143, p. 13804.

In essence the Department has adopted the rule making provisions of the Administrative Procedure Act, 5 U.S.C. § 553,[7] and made them applicable to the administration of loans. Basically, the statute requires that when a substantive rule is involved and none of the numerous exemptions applies, then administrative agencies shall:

1) Give advance notice by publication in the Federal Register of the proposed rule making. This notice shall include a statement of the time, place and nature of the public rule making proceedings, reference to the legal authority under which the rule is proposed and the terms of the proposed new rule.

2) After that notice is given, the agency shall give interested persons an opportunity to participate in the rule making.

3) The agency shall incorporate in the rule adopted a statement of its basis and purpose.

4) After the substantive rule is adopted, it shall be published in the Federal Register, not less than thirty days before its effective date.

In adopting the directive of December 27, 1972, defendants did not comply with even one of these mandatory requirements, despite the fact that the directive would have a substantial impact on those regulated, and hence is a "rule" as contemplated in the statute. *See,* Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858 (D.Del.1970); Texaco Inc. v. FPC, 412 F.2d 740 (3rd Cir. 1969); National Motor Traffic As-

---

6. No such finding has been published.

7. That statute provides:
    (a) This section applies, according to the provisions thereof, except to the extent that there is involved—
    (1) a military or foreign affairs function of the United States; or
    (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.
    (b) General notice of proposed rule making *shall* be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
    (1) a statement of the time, place, and nature of public rule making proceedings;
    (2) reference to the legal authority under which the rule is proposed; and
    (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
    Except when notice or hearing is required by statute, this subsection does not apply—
    (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or
    (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.
    (c) After notice required by this section, the agency *shall* give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency *shall* incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
    (d) the required publication or service of a substantive rule *shall* be made not less than 30 days before its effective date, except—
    (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
    (2) interpretative rules and statements of policy; or
    (3) as otherwise provided by the agency for good cause found and published with the rule.
    (e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule. P.L. 89–554, Sept. 6, 1966, 80 Stat. 383. (Emphasis added)

sociation v. United States, 268 F.Supp. 90 (D.D.C.1967). *See also*, A. E. Staley Manufacturing Co. v. United States, 310 F.Supp. 485 (D.Minn.1970); Housing Authority of the City of Omaha, Nebraska v. United States Housing Authority, 54 F.R.D. 402 (D.Neb.1972).

The failure to give notice prior to the termination of the loan program is also in violation of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. As stated by Judge, now Chief Justice Burger in Gonzalez v. Freeman, *supra*:

> The command of the Administrative Procedure Act is not a mere formality. Those who are called upon by the government for a countless variety of goods and services are entitled to have notice of the standards and procedures which regulate these relationships. 334 F.2d at 578.

Section 3 of the Administrative Procedure Act (5 U.S.C. § 552) provides, in mandatory language, as follows:

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members, from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Inherent in these provisions is the concept that the public is entitled to be informed as to the procedures and practices of a governmental agency, so as to be able to govern their actions accordingly. The termination of the emergency loan program was without any notice, and was in violation of the provisions of the statute. The last paragraph of 5 U. S.C. § 552(a)(1) provides:

> Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published . . . .

Notice after the termination of the loan program as was here given can in no way be considered timely. Furthermore, the deprivation of the right to file claims for the loans certainly adversely affected the plaintiffs.

As justification for terminating the loan program in Minnesota, the government argues that there was a shortage of available funds. The emergency loan program is funded by a "revolving fund" referred to as the Agriculture Credit Insurance Fund. Moneys received in connection with loans procured under the fund are credited to the fund and are used for making additional loans. In order to obtain additional money for the fund the Secretary of Agriculture is authorized to make and issue notes to the Secretary of Treasury. 7 U.S.C. § 1928. To draw upon the fund, the Secretary of Agriculture must procure an apportionment from the Office

of Management and Budget pursuant to the Anti-Deficiency Act, 31 U.S.C. § 665. The original apportionment for Emergency Loans was $135 million. The government argues that agency estimates indicated that the total commitment of emergency loans would be approximately $800 million.

It is the opinion of the Court that the government's contentions are not justified. It is true that the Secretary is prohibited from spending funds in excess of the apportionment. However, there is nothing magic in an apportionment; that is, an original apportionment by the Office of Management and Budget is subject to change. In fact, the Office of Management and Budget is required by law to review each apportionment at least four times each year in order to make "effective use of the appropriation concerned." 31 U.S.C. § 665(c)(4).[8]

In appropriating funds for the emergency loan program, Congress set no monetary limit on the funds that may be apportioned for emergency loans. The appropriation reads as follows:

> The following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for Agriculture-Environmental and Consumer Protection programs for the fiscal year ending June 30, 1973, and for other purposes namely: . . .

> AGRICULTURAL CREDIT INSURANCE FUND

> . . . For loans to be insured, or made to be sold and insured, under this fund in accordance with and subject to the provisions of 7 U.S.C. 1928–1929, as follows: real estate loans, $370,000,000, including not less than $350,000,000 for farm ownership loans; water and waste disposal loans, $300,000,000; and emergency loans in amounts necessary to meet the needs

resulting from natural disaster. 92 U.S.Code Cong. and Admin.News 338, 3397.

      In January and again in February of 1973, the Secretary did request and receive additional apportionments of funds for emergency loans bringing the total apportionment of funds to $500 million. The government offers no explanation as to why the Secretary could not request an apportionment that would be sufficient to cover the claims of the plaintiffs in this case. The Secretary has made the determination that there were needs for agricultural credit in the fifteen Minnesota counties involved, yet the Secretary is apparently unwilling to take the necessary procedural steps to insure that the financial needs of the farmers involved are fulfilled in the manner contemplated by Congress. Congress has appropriated sufficient funds to carry out the emergency loan program. It is the Secretary's duty to request an apportionment from the Office of Management and Budget, that would carry out the directives of Congress.

      It may be that the Secretary questions the efficacy of the emergency loan program. It is not the role of the Courts to pass upon the necessity or soundness of a duly-promulgated law; likewise, an administrator should not engage in such a practice. It is the duty of the Courts to interpret the law and it is the function of the Administrator to enforce and effectuate the laws passed by Congress.

Furthermore, although the emergency loan program was terminated in Minnesota without notice on December 27, 1972, the program was continued in the areas declared as disaster areas by the President. Since December 27, 1972, $270 million has been obligated for emergency loans and the Department anticipates that another $150 million in emergency loans will be approved. If

---

8. 31 U.S.C. § 665(c)(4) provides:
Apportionments shall be reviewed at least four times each year by the officers designated in subsection (d) of this section to make apportionments and reapportion-

ments, and such reapportionments made or such reserves established, modified, or released as may be necessary to further the effective use of the appropriation concerned, . . . ..

the government were correct in its claim that there was a shortage of funds for the program, it is not at all clear as to why this shortage of funds is evident only in areas designated by the Secretary. The government offers no rational explanation to this grossly inequitable result. There is absolutely no basis in the law to give preference in the administration of emergency loans to Presidentially declared disaster areas.

The bill that eventually became P.L. 92–385 was originally proposed by the Administration, *solely* to benefit victims of Hurricane Agnes in areas designated by the President. However, while the bill was being considered in Senate Committee, word was received of the disastrous weather conditions in West Central Minnesota. The report states:

The Committee notes that there have been 37 Presidentially designated disasters and 84 administratively declared disasters since January 1, 1971, including the disasters associated with Agnes and the Rapid City flood. *The Committee agrees that the victims of all these disasters should be treated in the same manner insofar as disaster relief is concerned, and that it would be wrong and unfair to accord victims of particular disasters special treatment.*

Moreover, the Committee notes that in the future other disasters may occur. For example, while this legislation is being discussed in the Committee, *a serious new flood occurred in Central Minnesota devastating as many as ten counties and the same number of large towns. The Committee agreed that victims of future disasters, like this one in Minnesota, should receive the same measure of relief under disaster relief legislation which is accorded to victims of disasters which have already been declared. In no case should people sustaining comparable injury be afforded lesser relief because of their location in different* *disaster areas.* Senate Report No. 92–1008, U.S.Code Cong. & Admin. News, 1972, p. 2952. (Emphasis added)

The Secretary's actions in giving a preference to Presidentially designated areas is not in keeping with the Congressional intent in promulgating the emergency loan program.

It is the opinion of the Court that the defendants have a ministerial duty to implement the emergency loan program as directed by Congress, that the unilateral termination of the program without notice to the plaintiffs in this case was in violation of the statutes, the agency's own regulations, and due process of law. Furthermore to the extent that the administrators may have some discretion under the applicable statutes, in terminating the emergency loan program in Minnesota without prior notice, the administrator acted in an arbitrary and capricious manner.

### Order for Judgment

Based on the reasons as set forth in the attached Memorandum,

It is hereby ordered that:

1. Defendants' action of December 27, 1972, which terminated, without notice, the FHA Emergency Loan Program in Minnesota, is unlawful and all subsequent actions taken in implementation or furtherance of that action are unlawful.

2. Defendants' Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim upon which relief may be granted, is denied.

3. Defendants' alternative Motion for Summary Judgment is denied.

4. Persons situated similar to plaintiffs, within the class represented by plaintiffs, include established farmers (a) who suffered loss as the result of natural disasters; (b) who operate

farms in one or more of the fifteen Minnesota counties designated emergency loan areas by the Secretary of Agriculture on June 26, 1972, and September 20, 1972; and (3) who did not file applications for FHA initial emergency loans prior to December 26, 1972.

5. Defendants, their successors and agents shall reinstate the Farmers Home Administration (FHA) Emergency Loan Program for natural disaster victims in the fifteen Minnesota counties designated Emergency Loan Areas by the Secretary of Agriculture on June 26, 1972 and September 20, 1972, which program was unlawfully terminated by the Secretary of Agriculture on December 27, 1972. To accomplish this, it is ordered that the defendants, their successors and agents shall:

(a) Accept and file FHA emergency loan applications of plaintiffs and others similarly situated, if submitted to County FHA offices on or before June 30, 1973; and

(b) Process said applications as expeditiously as possible, and without delay grant emergency loans thereon to applicants found to be qualified pursuant to the same lawful eligibility and loan purpose requirements on the same basis as they were applied by the Farmers Home Administration between August 16, 1972, and December 27, 1972; and

(c) Pay and deliver the proceeds of approved loans to qualifying applicants without delay.

It is further ordered that this Order shall take effect immediately, except that Subparagraph (c) of this Order, which directs the payment and delivery of loan proceeds, is stayed for a period of ten days from the date hereof.

It is further ordered that in the event an appeal is taken, because of the urgency of this matter, the parties are directed to take all possible steps to procure an expedited appeal.