714 F.2d 1510
 Ronald E. PAYNE, Individually and on behalf of himself and
others similarly situated, Plaintiffs-Appellees,
v.
John R. BLOCK, Individually and as Secretary of the United
States Department of Agriculture, et al.,
Defendants-Appellants,
v.
James J. COLLINS, Movant-Appellant-Intervenor.
 No. 81-5365.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 19, 1983.
 
 Michael Kimmel, Dept. of Justice, Civ. Div., Washington, D.C., for Block, FHA, Dept. of Agriculture.
 William R. King, Haas, Holland, Lipshutz, Levison & Gibert, Atlanta, Ga., for Collins, intervenor.
 J. Victor Africano, Live Oak, Fla., Moorey, Seals & Garvin, Theodore L. Tripp, Jr., Fort Myers, Fla., Charles L. Carlton, Carlton & Carlton, Lakeland, Fla., for plaintiffs-appellees.
 Appeals from the United States District Court for the Middle District of Florida.
 Before GODBOLD, Chief Judge, HENDERSON and CLARK, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 Beginning about April 1, 1973, thirteen north Florida counties received a series of torrential rains resulting in flooding, crop damage, and property damage.[1] Pursuant to the Disaster Relief Act of 1970,[2] the President, on May 26, 1973, declared the aforementioned area a major disaster area.[3] 38 Fed.Reg. 14800 (1973). The Farmers Home Administration (FmHA) was authorized and funded by the Consolidated Farm and Rural Development Act, 7 U.S.C. sections 1961-69, to make emergency loans in this thirteen-county area.[4] Originally the application period for production losses was nine months (ending February 26, 1974) and for property damage was sixty days (ending July 30, 1973). Apparently, crop losses are allowed a longer filing period because of the inability to determine the extent of loss prior to harvest and sale. The initial terms of the emergency loans included a 5% per annum interest rate and a provision requiring applicants to show an inability to obtain credit from commercial lenders.[5]
 
 
 2
 Ronald E. Payne, a farmer in one of the designated counties, brought a class action suit against the FmHA, United States Department of Agriculture, seeking injunctive relief to secure for himself and all similarly situated farmers in the area the right to apply for emergency loans.[6] Plaintiffs alleged inadequate notice of the availability of loans due to FmHA's failure to adhere to its own regulations providing for appropriate notice.[7]
 
 
 3
 The applicable FmHA regulations in effect during this initial loan application period included provisions prescribing notice of the availability of loans to eligible area farmers. The Code of Federal Regulations contained the following section:
 
 
 4
 (a) [T]he State Director [of the FmHA] will notify the appropriate County Supervisors immediately and instruct them to make EM loans available under sec. 1832.13. His notification will be confirmed by State requirements issued as soon as possible. The State Director will also notify the USDA Defense Board Chairman and will make such public announcements as appear appropriate.
 
 
 5
 (1) Immediately upon receiving notice about the counties under his jurisdiction, the County Supervisor will notify the appropriate County USDA Defense Board Chairman and make such public announcements as appear appropriate about the availability of EM loans under sec. 1832.13. Also, the County Supervisor will explain to other agricultural lenders in the area the assistance available under this program.
 
 
 6
 7 C.F.R. sec. 1832.3(a)(1) (1973). The alleged failure of the agency to comply with the regulation is the gravamen of the original complaint.
 
 
 7
 Regarding announcement of the availability of emergency loans in designated disaster areas, Claude Greene, State Director of FmHA, issued notification to all county supervisors in the affected area.[8] On June 4, 1973, Greene also sent a sample press release to the county supervisors with instructions to "use it as soon as possible." The release stated that applications should be submitted prior to July 30, 1973; it totally omitted any reference to the nine-month period, expiring February 26, 1974, in which to apply for production losses. The release was routinely forwarded to the local media. However, county officials made no follow-up to determine whether the press release was published. Several newspapers carried information concerning the FmHA program, but only one printed the release in full and others contained erroneous information in addition to omitting notice of the longer application period for crop loans.
 
 
 8
 The President's Office of Emergency Preparedness coordinated a week-long public meeting at the Live Oak, Florida, Coliseum in early June 1973. Various government agencies set up booths each manned by an agency representative for the purpose of supplying information regarding the available disaster relief programs.[9] The FmHA booth was manned by an agency representative for a short period of time and by a volunteer the remaining time. Apparently, the volunteer was without knowledge of or familiarity with FmHA programs generally or this emergency program specifically. Several farmers attending the meeting testified that they were told no relief was available for farmers who had sustained crop losses but only for those who had sustained damage to their homes. Record Vol. 5 at 207, 228, 267-68; Vol. 8 at 589. Moreover, testimony indicated that FmHA officials were aware of the losses suffered as a result of the flooding. Record Vol. 8 at 684-86. The FmHA maintains that handout materials about the emergency loans and application forms were available at the meeting. However, the FmHA processed no applications and granted no emergency loans in this thirteen-county area during the 1973 loan period.
 
 
 9
 The government contends that no loans were made during this period because of credit available elsewhere. However, many of these lenders, such as the Small Business Administration, did not extend loans for crop losses. Record Vol. 10 at 1071. The government also asserts that the actual damage sustained by area farmers was much less than originally estimated.
 
 
 10
 On January 2, 1974, the President of the United States signed Public Law No. 93-237,[10] which extended the application period for emergency loans to April 2, 1974. The new law provided for more attractive loan terms [the interest rate was dropped to 1% and the first $5,000 was forgiven] and eliminated the requirement that loan applicants be unable to obtain sufficient credit elsewhere. Notice of the reopened application period was not published in the Federal Register until February 27, 1974, so that two-thirds of the extended application period had expired.[11] The regulations provided that the county supervisor was to prepare a list of paid-up and indebted borrowers who had received emergency loans, notify each person on the list of the new terms, and determine if that person was eligible for any benefit under the new terms of the loan. Since no one filed an emergency loan application during the first application period, no letters were sent.
 
 
 11
 The new regulation also stated that "State Directors will issue an instruction setting forth this information [regarding Public Law No. 93-237] for use in their respective states. State Directors and County Supervisors will inform the news media including newspapers, radio, and television in the affected counties of the provisions of P.L. 93-237." 39 Fed.Reg. 7570 (1974). On February 28, 1974, the state director issued a memorandum and sample press release to all county supervisors.[12] The sample press release stated that loan applications would be taken under the terms of the new law. Contrary to the mandate of the regulation, the release did not recite the terms of Public Law No. 93-237. The press release was routinely forwarded to the local media but received little publication. No other efforts at notification were undertaken.[13] Only three or four loans were granted during this second period. Plaintiffs attack the agency's failure to comply with this regulation as the second prong of their inadequate notice argument.
 
 
 12
 Inquiring into possible reasons or motivations for this failure to provide notice and, thus, ultimately to grant loans, we are acutely aware of the historical background of this case. The political climate of the early 1970s was one of considerable struggle between the executive and legislative branches of government. Congress appropriated monies for various programs and the executive branch refused to spend the funds on those it considered unwise. Several impoundment cases arose,[14] hearings were held,[15] and statutes were passed.[16] As indicated earlier, in the area of agriculture Congress had passed very generous loan legislation. Pub.L. No. 92-385, 86 Stat. 554 (1972). The Secretary of Agriculture, however, by administrative fiat curtailed the grant of these loans. Injured farmers in Minnesota filed suit against the Secretary of Agriculture seeking reinstatement of the program. They alleged that the Secretary acted unlawfully and beyond the scope of his authority in terminating the FmHA emergency loan program. The district court agreed, finding the Secretary's action in violation of applicable statutes, departmental regulations, and due process of law. Berends v. Butz, 357 F.Supp. 143 (D.Minn.1973).
 
 
 13
 At the congressional hearings on Impoundment of Appropriated Funds by the President, then-Secretary Butz testified that in an effort to reduce spending his agency examined existing programs and withheld funds from those it found "least essential."[17] The decisions were made on the basis of "subjective judgment."[18] In response to the "termination" of the emergency loan program and in order to assure reinstatement of the program, Congress repealed 92-385 to the extent of its generous loan terms. Pub.L. No. 93-24, 87 Stat. 24 (1973). Congress also provided for the applicability of the terms of 92-385 to previously declared disasters. Id.; Pub.L. No. 93-237, sec. 4, 87 Stat. 1023 (1974). In an apparent attempt to persist in executive budgetary goals, the agency then merely withheld appropriate notice of the loan program.
 
 
 14
 Following a bench trial in the instant case, the district court issued an order and opinion on February 11, 1981 finding that the notice of the emergency loan program was insufficient to comport with the applicable regulations providing that the state director and county supervisors "make such public announcements as appear appropriate." 7 C.F.R. sec. 1832.3(a)(1) (1973). The district court also found that specific types of notice provided for in the regulations were not effectuated. Id. Judgment was entered for the plaintiff and the recertified class with the court ordering the FmHA to reopen the 1973-74 emergency loan program in the designated counties and the parties to submit a plan for notification of class members. A plan was submitted and accepted, and the district court denied defendants' motion for suspension of injunction pending appeal. Defendants filed an appeal and ultimately obtained in this court a stay of the injunction pending appeal in this court. An amended final judgment adding a second class representative as party plaintiff was later entered.[19] Record Supp. Vol. 1 at 4.
 
 
 15
 On appeal, the government contests the authority of the district court to reopen the emergency loan program and contends that the original public notice was sufficient. Upon review of these issues and the evidence presented, we affirm the district court.[20]
 
 Propriety of the District Court Remedy[21]
 
 16
 The government's primary position in this case is that the 90-day extension of Public Law No. 93-237 constitutes a legislatively enacted termination date of the benefits of 93-237 and as such deprives the agency of the authority to reopen the loan application process. Thus, assuming a failure to notify, the agency is left in the absurd position of arguing that it can disobey a congressional mandate to make loans available to eligible farmers but has no authority to make the loans in cases of inadequate notice of availability because Congress did not mandate an extension of time for those cases. The government maintains that since the statutory deadline for seeking assistance has long since expired, no statutory authority exists, as is needed, for making emergency loans under the terms of that program at this time. The government does not contend that funds are no longer available for these emergency loans,[22] just that no authority exists to expend them for this disaster absent a timely filed application.
 
 
 17
 The government's initial brief chiefly relied on the Ninth Circuit's decision in Emergency Disaster Loan Association, Inc. v. Block, 653 F.2d 1267 (9th Cir.1981). Although based upon a similar factual setting, we find the case inapposite. The Ninth Circuit case failed to consider the regulation published on February 27, 1974 requiring notice to prior applicants and the news media. The court considered only an earlier internal Special Instruction which embodied the same terms but, as such, was found to be discretionary. As was apparently the case in the Ninth Circuit, the government in this case failed to bring to our attention the notice provision in the above-mentioned regulation. The government's reply brief, however, did footnote the error contained in its main brief. An additional distinction between the Ninth Circuit case and the instant one is that there the plaintiffs sought mandamus. The Ninth Circuit denied that relief since the instruction was discretionary and thus unenforceable in an action for mandamus. See generally United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 420, 51 S.Ct. 502, 504, 75 L.Ed. 1148 (1931).
 
 
 18
 Traditionally, the Secretary of Agriculture declared as a matter of policy the duration of application periods for emergency loans.[23] Public Law 93-237 maintained that policy, see 39 Fed.Reg. 7570 (1974) ("Termination dates for any new counties that might be designated after January 2, 1974, will follow the current policy (60 days for physical losses and 9 months for production losses)."), but provided that for "all disasters occurring on or after December 27, 1972, the Secretary of Agriculture shall extend for ninety days after the date of enactment of this [statute] the deadline for seeking assistance under ... the Consolidated Farm and Rural Development Act." Public Law No. 93-237, sec. 10(c), 87 Stat. 1023 (1974). Thus, an extended termination date of April 2, 1974 was set for the acceptance of applications for all losses resulting from the instant disaster. 39 Fed.Reg. 7570 (1974).
 
 
 19
 This "statutory" reopening of the application period was a result of contemporary changes in the disaster relief laws which caused public uncertainty as to the terms of emergency loans.[24] Congress was "concerned that administratively set deadlines ... set by the [FmHA] ... may expire, thus precluding ... farmers ... from applying for benefits under [93-237]." Conf.Rep. No. 93-363, 93d Cong., 1st Sess. 2, reprinted in 1973 U.S.Code Cong. & Ad.News 3342, 3343. Thus, Congress indicated its expectation that the FmHA would extend the deadline for seeking relief for previously declared disasters as a result of the enactment of 93-237. Conf.Rep. No. 93-363, 93d Cong., 1st Sess. 2, reprinted in 1973 U.S.Code Cong. & Ad.News 3342, 3343-44. This expectation was incorporated into the statutory language. Pub.L. No. 93-237, sec. 10(c), 87 Stat. 1023 (1974).
 
 
 20
 The materials cited above clearly demonstrate Congress' concern that the benefits of the emergency loan program be extended to all eligible farmers and that they have ample opportunity to derive benefits therefrom. The "statutory" deadline was inserted merely to insure agency adherence to congressional intent. That extension operated as a congressional demand to the Secretary of Agriculture to extend the application period.[25] To equate the "statutory" extension to a congressional termination of benefits overlooks the context in which the act was passed. No statutory authorization is required, as the government here contends, for the Secretary to extend deadlines merely because Congress inserted a deadline in a disaster relief law which originally was designed to remedy a Secretarial curtailment of loan grants. See Sen.Rep. No. 93-85, 93d Cong., 1st Sess. 1, reprinted in 1973 U.S.Code Cong. & Ad.News 1285. Application deadlines are normally administratively prescribed. FmHA's application period is a policy decision of that agency and expandable by the agency. We do not condone the failure of potential loan applicants to follow legitimate time restrictions set as a prerequisite to applying for governmental benefits. However, we do find that where, as here, exigent circumstances beyond the farmers' control precluded intended beneficiaries from applying for loans, the agency had the power to extend the loan period and the district court was within its power in ordering the agency to do so. To hold otherwise would allow FmHA to totally fail to provide notice to congressionally intended potential beneficiaries and avoid being called to task for such conduct.[26]
 
 
 21
 The liability of the agency in this case is grounded in Congress' enactment of legislation directing the Department of Agriculture to implement the terms of the legislation, the agency's passage of implementing regulations, and the agency's failure to follow the resulting affirmatively required procedure. See generally United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); United States v. Heffner, 420 F.2d 809 (4th Cir.1970). An agency must follow its own procedure even though the procedure is more stringent than would constitutionally be required. Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, 293 (1974). The FmHA regulations in issue are not merely statements of agency policy. The notice provisions were all promulgated in the Code of Federal Regulations and constituted rules of procedure governing emergency loan programs legislated and funded by Congress. FmHA must adhere to those rules.
 
 
 22
 We reject FmHA's contention that Schweiker v. Hansen, 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam), controls this case. In Schweiker v. Hansen, a Social Security employee erroneously informed an inquiring claimant of her ineligibility for government benefits, resulting in her failure to file an application. A written application was a prerequisite to receiving benefits. An internal claims manual instructed agents to recommend such a filing to uncertain inquirers. Upon a later filing and receipt of the benefits in issue, plaintiff brought suit to estop the Secretary of Health and Human Services from denying complete retroactive benefits for the period in which plaintiff was eligible but had not filed a written application. The Court found estoppel inapplicable to the case since an internal instruction is not a binding regulation, plaintiff was able to correct the misrepresentation, and the estoppel would threaten the public fisc.
 
 
 23
 In Hansen, the claimant was negligent in failing to file an application and the agency employee was negligent both in failing to instruct her to file and in advising her of ineligibility. The present case is not an instance of a single government employee negligently failing to follow intra-office procedure and an agency nevertheless insisting on adherence to its regulations. This is not a case of a negligent plaintiff.[27] Rather, this is a case of gross failure on the part of an entire agency to follow self-imposed regulations prescribing adequate notice to potential applicants. Additionally, the error in Hansen was revocable. By filing an application on any subsequent day, the claimant could have corrected the error or obtained the benefits.[28] Clearly, the Florida farmers have available no such remedial option; the court must reopen the application period for availability of benefits. Perhaps the most important difference in Hansen, however, is the potential ramifications on the public fisc. If a person could obtain retroactive Social Security benefits by claiming to have visited the office and been told of ineligibility, the expenditure of funds on proof of claimant eligibility and employee behavior could be astounding. The district court's remedy in the present case does not threaten the public fisc. Loans, which presumably are repaid, are involved. A revolving fund exists for such loans. The remedy merely provides for a reopening of the application period; farmers must still demonstrate eligibility for relief. We must presume that the agency in the future will give sufficient notice to the public of the availability of emergency loans and that this factual situation will not recur.[29]
 
 
 24
 Having thus found the agency responsible for violating its own procedure as prescribed by law, relying on Ruiz, 415 U.S. at 235, 94 S.Ct. at 1074, Accardi, 347 U.S. at 268, 74 S.Ct. at 503, and Heffner, 420 F.2d at 811-12, and having held this not to be a case of negligence as in Hansen, Augusta Aviation, 671 F.2d at 449, and Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), we turn to the government's final contention.
 
 Sufficiency of Notice
 
 25
 Appellants claim that notwithstanding their other contention, the district court committed reversible error in concluding that the notice transmitted by FmHA regarding its emergency loan program was legally insufficient. The government argues that notice was provided in the Federal Register, the appropriateness of the notice is committed to agency discretion and hence not judicially reviewable, and FmHA otherwise complied with the applicable regulations. Appellees assert that FmHA failed to comply with specific notice requirements imposed by regulation, the public announcements were inappropriate as a matter of law, and the notice was insufficient under the due process clause of the fifth amendment.
 
 
 26
 At the time of publication of the disaster declaration,[30] the applicable regulations specifically instructed FmHA officials to notify the state and appropriate county USDA Defense Board Chairmen and other agricultural lenders in the area. 7 C.F.R. sec. 1832.3(a)(1) (1973). The regulations also provided for other "such public announcements as appear appropriate." Id. Pursuant to the passage of Public Law No. 93-237, the Federal Register carried notification of the extended application period and an instruction to FmHA officials to "inform the news media including newspapers, radio, and television in the affected counties of the provisions of P.L. 93-237."[31]
 
 
 27
 The district court specifically found that "Defendants did not comply with the regulations requiring the giving of notice to State and County USDA Defense Boards and agricultural lenders in the community." Record Vol. 3 at 104. Several exhibits indicate that FmHA requested a meeting of Defense Board personnel to acquaint them with the availability of USDA assistance to disaster victims. Plaintiffs' Exhibits 12-15; Defendants' Exhibit 5. Such a request and subsequent meeting probably suffices to meet the directive that the State Director notify the USDA Defense Board Chairman. See 7 C.F.R. sec. 1832.3(a). Evidence exists, however, indicating that the notice given at this meeting stated only that applications should be filed by the July 30, 1973 deadline. A telegram clarifying the February 26, 1974 deadline for production losses was not received by the State Director until July 9, 1973--some time after the meeting. Plaintiffs' Exhibit 17. As to the county supervisor's duty to notify the appropriate county USDA Defense Board Chairman, several county supervisors testified that they normally maintained contact with the USDA Defense Board and conversed regarding the emergency loan program information. Record Vol. 5 at 173-74; Vol. 9 at 935-37, 967. Several county supervisors also testified that they informed agricultural lenders in the area of the emergency loan program. Record Vol. 6 at 306; Vol. 9 at 936. The Chairman of the Board of Directors of the local Federal Land Bank testified, however, that he was unaware of the FmHA emergency loan program and had he been aware would have applied for a loan for his disaster related losses. Record Vol. 8 at 586-609. Area farmers also testified that they borrowed money on less favorable terms from other lenders during this time period. Record Vol. 5 at 208, 231-32; Vol. 7 at 480-81, 504-05.
 
 
 28
 While agreeing that community agricultural lenders were without sufficient notice, this intra-agency/business notice pertains only peripherally to the issue on which we affirm the district court's finding of inadequate notice.[32] FmHA failed to comply with federal regulations specifically designed to transmit notice of available emergency loan programs to the public. FmHA made no loans during the initial application period and only a handful during the renewed period. The press releases mandated during the reopened loan period, see 39 Fed.Reg. 7570 (1974), consisted of one state-issued sample press release forwarded to local newspapers by county officials. Aside from receiving little publication, the sample press release merely stated that "loan applications will be taken under the terms of a new law (P.L. 93-237) enacted January 2, 1974." Plaintiffs' Exhibit 21. It said nothing of the availability of a reduced interest rate, the possibility of a partial cancellation of loan principal, or the elimination of the "credit available elsewhere" requirement. The notice failed to "inform the news media ... of the provisions of P.L. 93-237." 39 Fed.Reg. 7570 (1974) (emphasis supplied).
 
 
 29
 In light of FmHA's failure to comply with specific prescriptions for notice, we find it unnecessary to determine whether FmHA provided "such public announcements as appear appropriate" or whether in fact such a requirement is judicially reviewable.[33] We do note, however, the paucity of public announcement during both the initial and reopened application periods. Especially is this continual dearth of public notice noteworthy where the state director testified that his staff and he were "flabbergasted" at the lack of response to the emergency loan program. Record Vol. 8 at 658.
 
 
 30
 In contrast to the procedure invoked by FmHA for disseminating notice of emergency loan availability, the Small Business Administration (SBA) and Agricultural Stabilization and Conservation Service (ASCS) transmitted numerous detailed notices to the potential beneficiaries of their respective programs. SBA authored at least three extensive notices listing its program's specific terms which were sent to the available area media offices, including the Jacksonville UPI and AP offices, four television stations, and numerous newspapers and radio stations. Record Vol. 10 at 1060-65. ASCS used its ongoing system of monthly newsletters to inform farmers of its emergency program and would have allowed other agencies to use this source of notice if asked. Record Vol. 7 at 540-52; Vol. 9 at 882-85. Moreover, some testimony revealed the possible existence of a "sign-up" sheet emanating from the week-long disaster meeting coordinated by OEP which could have been utilized by FmHA in contacting interested area farmers.[34] Record Vol. 9 at 1023; Vol. 10 at 1077-78.
 
 
 31
 Our review of the record convinces us that the district court was not clearly erroneous in its six pages of findings of fact and that it was correct in its ultimate conclusion of insufficient notice. See Marable v. H. Walker & Associates, 644 F.2d 390, 395 (5th Cir. Unit B 1981).[35]Motion to Intervene
 
 
 32
 James H. Collins, Jr., a Georgia farmer, sought to intervene in this suit individually and on behalf of all others similarly situated.[36] The class Collins seeks to represent is one of all farmers in the 27 states and Puerto Rico who live in areas declared disaster areas during the same time period as the initial suit,[37] who suffered losses as a result of the natural disaster which was the subject of said designations, and who were eligible to apply for emergency disaster loans but were not notified of their eligibility to apply.[38] The district court denied Collins' motion to intervene as an individual and class plaintiff, finding the motion untimely since the case had already "proceeded to final judgment and [was then] on appeal."[39] Record Vol. 4 at 131. Collins appeals to this court.[40]
 
 
 33
 The timeliness of a motion to intervene is a question largely committed to the district court's discretion. Howse v. S/V "Canada Goose I", 641 F.2d 317 (5th Cir. Unit B 1981). The standard of review is abuse of discretion. Stallworth v. Monsanto Co., 558 F.2d 257 (5th Cir.1977). As in the instant case, courts often are reluctant to grant leave to intervene post-judgment. "Interventions after judgment have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court." United States v. United States Steel Corp., 548 F.2d 1232 (5th Cir.1977).
 
 
 34
 After careful consideration of the arguments in support of intervention, we find no abuse of discretion in the trial court's denial of leave to intervene. The appeal decided today results from a case involving extensive discovery and lengthy litigation. The testimony relates almost solely to action or inaction by state and county officials in Florida. To allow the requested intervention would require exhaustive discovery to determine what information was disseminated in 27 states and Puerto Rico.[41] Since our finding of insufficient notice is limited to one specific disaster declaration, the proposed intervention would inject into this case numerous issues not heretofore considered. Collins' admonition that we enter a Rule 54 judgment in favor of the existing plaintiffs and declare plaintiffs-intervenors a subclass is not well-taken. We note, however, that these would-be intervenors are not necessarily precluded by today's ruling from filing an independent action.[42] For the foregoing reasons and because a district court's proper denial of intervention is not a final judgment, United States v. United States Steel Corp., 548 F.2d 1232 (5th Cir.1977), we dismiss plaintiffs-intervenors' appeal for want of jurisdiction.
 
 Accordingly, the district court order is
 
 35
 AFFIRMED.
 
 
 
 [1]
 The counties involved were Baker, Columbia, Dixie, Gilchrist, Hamilton, Jefferson, Lafayette, Leon, Levy, Madison, Nassau, Suwannee, and Wakulla. 38 Fed.Reg. 14800 (1973)
 
 
 [2]
 Pub.L. No. 91-606, 84 Stat. 1744 (1970) (repealed or transferred 1974)
 
 
 [3]
 Emergency Loan Major Disaster Designation M345. Plaintiffs' Exhibit 8A. A presidentially declared disaster was normally coordinated by the Office of Emergency Planning (OEP). Record Vol. 10 at 1072. (OEP is also referred to as the Office of Emergency Preparedness.)
 
 
 [4]
 The Act provides:
 (b) The Secretary shall make loans in any such area designated by the Secretary in accordance with subsection (a) of this section and in any area designated as a major disaster by the President pursuant to the provisions of the Disaster Relief Act of 1970, as amended, (1) to established farmers, ranchers, or oyster planters who are citizens of the United States and (2) to private domestic corporations or partnerships engaged primarily in farming, ranching, or oyster planting: Provided, That they have experience and resources necessary to assure a reasonable prospect for successful operation with the assistance of such loan, and are unable to obtain sufficient credit elsewhere to finance their actual needs at reasonable rates and terms, taking into consideration prevailing private and cooperative rates and terms in the community in or near which the applicant resides for loans for similar purposes and periods of time.
 Pub.L. No. 87-128, 75 Stat. 311 (codified as amended at 7 U.S.C. sec. 1961(b) (1973)).
 
 
 [5]
 Pub.L. No. 93-24, sections 3, 4, 87 Stat. 24 (codified as amended at 7 U.S.C. sections 1961(b), 1964 (1973))
 
 
 [6]
 The original class was recertified as:
 All farmers in the thirteen county area covered by the Disaster Declaration M-345 who: 1) suffered damage from floods or severe storms in the major natural disaster declared by the President on May 26, 1973; and who 2) were eligible to apply for emergency disaster loans administered by the Farmers Home Administration pursuant to 7 C.F.R. sec. 1832 (1974), and 3) who were not notified that they were eligible to apply for emergency loans.
 Record Vol. 3 at 114.
 
 
 [7]
 The complaint as originally filed contained an action for money damages. Record Vol. 1 at 1. The district court dismissed that count, and plaintiff appealed. Record Vol. 1 at 50, 56. The appellate court dismissed the appeal for lack of a Rule 54(b) order. Record Vol. 1 at 59. Plaintiff did not file a new notice of appeal (cross-appeal) following final judgment in this case, and, thus, that count is not before us
 
 
 [8]
 Greene sent a letter dated May 31, 1973 to the county supervisors. Plaintiffs' Exhibit 8. The letter briefly outlined emergency loan availability
 
 
 [9]
 The agencies involved included the four agencies within the Department of Agriculture--FmHA, Soil Conservation Service, Agricultural Stabilization and Conservation Service, and Extension Service. FmHA functions as a credit agency for farmers. Soil Conservation Service provides technical assistance to farmers in developing conservation services or practices. Agricultural Stabilization and Conservation Service makes grants for conservation practices and controls production of controlled crops. Extension Service subsidizes the state agricultural service which provides technical and informational services to farmers. Representatives from these agencies comprise the USDA Defense Board which functions to provide information and coordinate USDA programs in times of emergencies. See generally Record Vol. 5 at 134-37
 
 
 [10]
 87 Stat. 1023 (1974)
 
 
 [11]
 39 Fed.Reg. 7569 (1974)
 
 
 [12]
 Plaintiffs' Exhibit 21
 
 
 [13]
 The complaint refers to a one-day public meeting in Suwannee County on or around March 14, 1974. Complaint p 15
 
 
 [14]
 E.g., Train v. City of New York, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); Berends v. Butz, 357 F.Supp. 143 (D.Minn.1973)
 
 
 [15]
 E.g., Impoundment of Appropriated Funds by the President: Joint Hearings Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Government Operations and the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. (1973)
 
 
 [16]
 Congressional Budget and Impoundment Control Act of 1974, Pub.L. No. 93-344, 88 Stat. 298 (codified as amended at 2 U.S.C. sec. 621 et seq. (1983))
 
 
 [17]
 Impoundment of Appropriated Funds by the President: Joint Hearings Before the Ad Hoc Subcomm. on Impoundment of Funds of the Senate Comm. on Government Operations and the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 93d Cong., 1st Sess. 532 (1973)
 
 
 [18]
 Id. at 554
 
 
 [19]
 During trial, plaintiff moved to add six parties plaintiff. Record Vol. 3 at 102 and Vol. 8 at 772-75. The district court stated that the motion would be granted. Record Vol. 10 at 1203. The final judgment, however, mentioned only Payne and the recertified class. Record Vol. 3 at 114
 Originally, appellant maintained plaintiff Ronald Payne's lack of standing to challenge the adequacy of notice and seek reopening of the loan program. See Brief for Appellant at 24-26. Appellant reasoned that because Payne had actual notice of the FmHA program and received a loan thereunder (see Complaint pp 14, 23, 25-32), he could demonstrate no injury in fact.
 Plaintiffs then sought a limited remand for the purpose of entering an amended final judgment. This court granted appellees' motion for limited remand, Record Supp. Vol. 1 at 3, and the district court entered an amended final judgment adding a second named class representative to the list of prevailing plaintiffs. Record Supp. Vol. 1 at 4-5. Thus, we find the standing issue moot. (We note that the government apparently abandoned the standing issue. The government's reply brief on this issue placed great emphasis on the fact that at that time the parties seeking to intervene as named representatives had not sought to have the court amend its judgment to include them. The standing issue was not mentioned at oral argument.)
 
 
 [20]
 We accept jurisdiction pursuant to 28 U.S.C. sec. 1291. The scope of our review is set out in Section 10 of the Administrative Procedure Act, 5 U.S.C. sec. 701 et seq. Section 706 provides in pertinent part:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning of applicability of the terms of an agency action. The reviewing court shall--
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 5 U.S.C.A. sec. 706 (1977).
 
 
 [21]
 This issue presupposes inadequacy of notice and goes only to the remedy. The issue of notice is discussed infra
 
 
 [22]
 Originally, the Emergency Credit Revolving Fund was established for carrying out the purposes of the Consolidated Farm and Rural Development Act. 7 U.S.C. sec. 1966 (1973). That fund was later abolished and its assets, liabilities, and authorizations transferred to the Agricultural Credit Insurance Fund, also a revolving fund. 7 U.S.C. sec. 1929(g)(1) (1973). See also Record Vol. 5 at 119-121. See generally Berends v. Butz, 357 F.Supp. 143, 155-56 (D.Minn.1973). In Berends, Minnesota farmers sought reinstatement of the administratively curtailed national emergency loan program. The court discussed the revolving loan fund and rejected the government's assertion of shortage of funds as justification for termination of the program
 
 
 [23]
 The 60-day time limit is a commonly used application period. The Small Business Administration (SBA), an agency also participating in disaster relief loans, used a 60-day deadline. Record Vol. 10 at 1081-82. SBA district director testified that his agency could extend the filing period. Id. FmHA's nine-month application period for production losses was apparently made pursuant to a verbal agreement between FmHA and the Office of Emergency Preparedness. See Record Vol. 5 at 79-81; Plaintiffs' Exhibit 17. These time periods were measured from the date of the disaster declaration. See Plaintiffs' Exhibit 17
 
 
 [24]
 In 1972, Congress passed Public Law No. 92-385, 86 Stat. 554 (1972). Section 328 of that amendment to the Consolidated Farmers Home Administration Act of 1961 (renamed as the Consolidated Farm and Rural Development Act by Public Law No. 92-419, 86 Stat. 657 (1972)) provided for generous emergency loan benefits. "Loans under this program were curtailed by the Department of Agriculture on December 27 [1972] for budgetary reasons, due in part to the forgiveness features and low interest rates provided for by Public Law 92-385." Senate Report No. 93-85, 93d Cong., 1st Sess. 1, reprinted in 1973 U.S.Code Cong. & Ad.News 1285, 1285. In order to reinstitute the much needed emergency loan program for farmers while avoiding the excessive costs inherent in section 328, Congress repealed section 328 as amended by Public Law No. 92-385 on April 20, 1973. Pub.L. No. 93-24, 87 Stat. 24 (1973). The 1973 act stated that the generous terms of section 328 were to remain applicable to disaster designations made after January 1, 1972 and before December 27, 1972 with applicants having 18 days to apply for loans. This created a hiatus between December 27, 1972 and April 20, 1973, the date of the repealing legislation, as to what type benefits to apply during that four-month period. Congress resolved that problem by enacting Public Law No. 93-237 on January 2, 1974. Pub.L. No. 93-237, 87 Stat. 1023 (1974). Disasters during the hiatus were to be treated in accordance with the generous terms of section 328 as amended, with applicants having 90 days to apply for loans. Pub.L. No. 93-237, sec. 4, 87 Stat. 1023 (1974)
 
 
 [25]
 "[T]he Secretary of Agriculture shall extend for ninety days after the enactment of this section the deadline for seeking assistance...." Pub.L. No. 93-237, sec. 10(c), 87 Stat. 1023 (1974) (emphasis supplied)
 
 
 [26]
 We emphasize that Congress had previously invoked, and "expected" FmHA would invoke, a similar reopening remedy in 93-237 when potential beneficiaries of the program were confused as to the program's terms
 
 
 [27]
 Neither is it merely a case of an agency disseminating incorrect information, Augusta Aviation, Inc. v. United States, 671 F.2d 445 (11th Cir.1982), or delaying the processing of an application to the potential beneficiary's detriment, I.N.S. v. Miranda, --- U.S. ----, 103 S.Ct. 281, 74 L.Ed.2d 12 (1983) (per curiam)
 
 
 [28]
 Ms. Hansen did, in fact, file an application some 10 or 11 months later after which time she received the requested benefits
 
 
 [29]
 We do not decide the remedy issue in this case on a theory of agent misrepresentation as to the nonavailability of emergency loans to farmers. The reopening of the application period is mandated by the failure to follow affirmatively required procedure. See generally United States v. Heffner, 420 F.2d 809 (4th Cir.1970). However, although the district court made no finding of affirmative misbehavior or willful failure to notify, we note the prevalence of such neglect at every level as well as the recurrence of the lack of notice
 
 
 [30]
 The disaster declaration was published on June 5, 1973. 38 Fed.Reg. 14800 (1973)
 
 
 [31]
 The notice provided that it was "being published without notice of proposed rulemaking, effective immediately, since it implements the provisions of Public Law 93-237, and because a delay in implementing the provisions of the public law by this regulation would be contrary to the public interest." 39 Fed.Reg. 7569 (1974)
 
 
 [32]
 A similar, tangential notice issue involves the regulations which became effective July 30, 1973 and required county supervisors to notify immediately the governing body of the county. 38 Fed.Reg. 20244 (1973). The applicability of this regulation is contested, the government contending relevance only to future emergency loan programs. Record Vol. 5 at 88. A letter from the Assistant Administrator of Farmer Programs to the State Director, however, directed the state official to hold in abeyance "the report to the county government contact ... until the final publishing [of new instructions] in the Federal Register of July 16, 1973." Plaintiffs' Exhibit 16; see also Record Vol. 5 at 85-93. After reviewing the evidence on this issue, we find that notice to the county commissions was generally lacking. See Record Vol. 6 at 307; Vol. 7 at 448-49, 478-79
 
 
 [33]
 While discretionary acts are not reviewable, acts tantamount to a refusal to exercise discretion are subject to judicial review. E.g., United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954)
 
 
 [34]
 In the state of Washington during the first loan period, state and county FmHA directors issued news releases to the Associated Press, United Press International, and local newspapers. A county director also made a personal television appearance on a show broadcast to the entire disaster area. Eleven loans were granted. During the second loan period, Washington state and county FmHA officials notified the prior eleven borrowers and sent out "several" news releases. The officials also contacted unsuccessful applicants from the first loan period. One county supervisor mailed out fact sheets to all active borrowers in his office file. FmHA granted 161 additional loans. The district court found the notice inadequate but entered judgment for the government on other grounds. The court of appeals affirmed. Emergency Disaster Loan Ass'n, Inc. v. Block, 653 F.2d 1267 (9th Cir.1981)
 
 
 [35]
 Plaintiffs also maintain that the emergency loan program constitutes a statutory entitlement and thus a species of property entitled to fifth amendment protection. FmHA expectedly argues no deprivation of property and, alternatively, that sufficient notice was given. Since nonconstitutional issues dispose of the case in favor of plaintiffs, we decline to rule upon the constitutional issue raised by plaintiffs. We note also our rejection of appellants' argument that because notice was provided in the Federal Register, the public was on constructive notice of the loan program. In the absence of specific regulations requiring specific types of notice, as well as the specific notice provision encompassed in the Federal Register and later codified in the Code of Regulations, this argument might prevail. However, in the posture of the regulations controlling this case, it appears spurious at best
 
 
 [36]
 In his brief in support of motion to intervene, Collins asserts that he is entitled to intervene as a matter of right and that he qualifies for permissive intervention. Record Vol. 4 at 130. On appeal, he appears to assert only intervention of right. Brief for the Intervenors at 26-34. See Fed.R.Civ.P. 24
 
 
 [37]
 The time period involved is December 27, 1972 through April 19, 1973, inclusive
 
 
 [38]
 Collins' complaint alleges that only one loan was granted by FmHA in Georgia during the relevant time period notwithstanding the designation of two disaster areas spanning 24 counties. Record Vol. 4 at 129
 
 
 [39]
 Actually, an appeal had not yet been filed, but a motion to stay the judgment pending appeal had. (The final judgment was entered March 5, 1981. The motion to intervene was filed April 14, 1981 and denied April 15, 1981. The Secretary of Agriculture filed a notice of appeal April 17, 1981.)
 
 
 [40]
 See Stallworth v. Monsanto Co., 558 F.2d 257, 263 (5th Cir.1977) ("[W]e are authorized to decide whether the petition[ ] for leave to intervene [was] properly denied.")
 
 
 [41]
 The fact-finding would require ascertainment not only of what specific notice was disseminated but also what type of notice was required for disaster declarations other than Presidential designations. For example, the disaster declaration in Georgia was a Secretarial designation
 
 
 [42]
 Appellant maintains and Collins does not refute that Collins filed an independent action in the Southern District of Georgia in May 1981. (On November 9, 1981, Collins v. Block, No. CV 281-63, was dismissed without prejudice for statistical purposes to be restored if circumstances warrant--stayed pending decision in another case.)